1   BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
    Alan R. Plutzik (Bar No. 077785)
2   L. Timothy Fisher (State Bar No. 191626)
    Kathryn A. Schofield (Bar No. 202939)
3   2125 Oak Grove Road, Suite 120
    Walnut Creek, California 94598
4   Telephone: (925) 945-0200
    Facsimile: (925) 945-8792
5
    Liaison Counsel for Plaintiffs
6
    SCHIFFRIN & BARROWAY LLP
7   Eric L. Zagar
    Robin Winchester
8   280 King of Prussia Road
    Radnor, PA 19087
9   Telephone: (610) 667-7706
    Facsimile: (610) 667-7056
10
    Attorney for Plaintiffs
11
                    UNITED STATES DISTRICT COURT
12
                  NORTHERN DISTRICT OF CALIFORNIA
13
                         SAN JOSE DIVISION
14

| 15 | IN RE INTUIT INC. | Master Case No. C06-03864 JF (PVT) |
| 16 | DERIVATIVE LITIGATION | **CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** |
| 17 | | |
| 18 | This Document Relates to: | |
| 19 | All Actions | |
| 20 | | **JURY TRIAL DEMANDED** |

Plaintiffs Beth Amado, Don Gallardo and Diane Linen Powell, by their attorneys, submit this Consolidated Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

### NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of nominal defendant Intuit Inc. ("Intuit" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, statutory violations, and other violations of law.

2.     On May 26, 2006, *Forbes*, in an article titled, "The Next Big Scandal," quoted Former Securities and Exchange Commission ("SEC") Chairman Harvey L. Pitt, saying "What's so terrible about backdating options grants?  For one thing, it likely renders a company's proxy materials false and misleading.  Proxies typically indicate that options are granted at fair market value.  But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

3.     On June 18, 2006, in an article titled, "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here' . . . It's a question of knowingly betting on a race that's already been run."

4.     On July 22, 2006, *The San Francisco Chronicle* recounted SEC Chairman Christopher Cox's announcement in San Francisco on July 20, 2006 where he said, "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. . . . It is securities fraud if you falsify books and records.  It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted accounting principles.  There is no requirement that (the defendant) personally profit [to prove that a crime occurred.]"

5.     On September 6, 2006, the United States Senate Committee on Finance held a hearing, "Executive Compensation: Backdating to the Future/Oversight of current issues regarding

1    executive compensation including backdating of stock options; and tax treatment of executive
2    compensation, retirement and benefits."

3        6.    At the Senate Finance Committee Hearing, the Senate Finance Committee
4    Chairman, Senator Chuck Grassley, in his opening statement, stated: "[Options backdating] is
5    behavior that, to put it bluntly, is disgusting and repulsive. It is behavior that ignores the concept
6    of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too
7    often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped
8    off by senior executives who rigged stock option programs – through a process called 'back-dating'
9    – to further enrich themselves. And as we have found far too often in corporation scandals of
10   recent years, boards of directors were either asleep at the switch, or in some cases, willing
11   accomplices themselves. . . ."

12       7.    At the Senate Finance Committee Hearing, the Chairman of the Securities Exchange
13   Commission, Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options]
14   results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a
15   violation of the tax laws." The Commissioner of the IRS Mark Everson agreed and further stated,
16   "Picking a date on which the stock price was low in comparison with the current price gives the
17   employee the largest potential for gain on the option and makes it possible for the employee to
18   benefit from corporate performance that occurred before the option was granted."

19       8.    In his statement before the Senate Finance Committee, Deputy Attorney General
20   Paul J. McNulty described the practice of stock option backdating "as a brazen abuse of corporate
21   power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders"
22   and said "For some of those companies that have now disclosed backdated grants, corporate
23   reputations have been tarnished and shareholder value has diminished substantially. . . ."

24       9.    On September 6, 2006, MarketWatch, in an article titled "SEC Probing more than
25   100 firms on options: Cox," quoted the Senate Banking Committee Chairman, Senator Richard
26   Shelby, saying that manipulation of options grant dates "appears to be a black-and-white example
27   of securities fraud," and "Corporate officers and directors engaging in this practice are cheating the
28   owners of the company and should be held accountable to the fullest extent possible."

10. Notwithstanding their protestations of innocence, the officers and directors of Intuit committed the egregious misconduct denounced by these government officials.

11. As alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Intuit, the Individual Defendants (as defined herein) colluded with one another to:

      a. improperly backdate dozens of grants of Intuit stock options to Intuit's President and Chief Executive Officer Stephen M. Bennett ("Bennett") and several other Intuit executives, in violation of the Company's shareholder-approved stock option plans;

      b. improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");

      c. improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code;

      d. produce and disseminate to Intuit shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

12. As a result of the Individual Defendants' egregious misconduct, Intuit has sustained millions of dollars in damages, and Bennett and the other recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14. Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

1

## PARTIES

2       15.     Plaintiffs Beth Amado, Don Gallardo and Diane Linen Powell are, and were at the

3   time of the misconduct complained of herein, shareholders of nominal defendant Intuit.

4       16.     Nominal defendant Intuit is a Delaware corporation with its principal executive

5   offices located at 2700 Coast Avenue, Mountain View, California 94043. According to its public

6   filings, Intuit is a leading provider of business and financial management solutions for small- and

7   mid-sized businesses, consumers, and accounting professionals. Upon information and belief,

8   Intuit has had more than 500 shareholders of record at all relevant times hereto.

9       17.     Defendant Stephen M. Bennett ("Bennett") has served as the Company's President

10  and Chief Executive Officer ("CEO") and as a director since January 2000.

11      18.     Defendant William V. Campbell ("Campbell") has served as a director of Intuit

12  since 1994 and as Chairman of the Board since August 1998. Campbell also served as a member

13  of the Compensation Committee of the Board, later renamed the Compensation and Organizational

14  Development Committee (the "Compensation Committee"), from 1998 to 2000. Campbell also

15  served as the Company's Acting Chief Executive Officer from September 1999 until January 2000

16  and as the Company's President and Chief Executive Officer from April 1994 through July 1998.

17      19.     Defendant Scott D. Cook ("Cook"), a founder of Intuit, has served as a director of

18  Intuit since 1984 and previously served as Intuit's Chairman of the Board from March 1993

19  through July 1998. From 1984 to 1994, Cook served as President and Chief Executive Officer of

20  Intuit.

21      20.     Defendant Eric C.W. Dunn ("Dunn") served in various capacities with the Company

22  from 1986 to 2000, including Chief Financial Officer, Vice President and General Manager, and

23  Senior Vice President and Chief Technology Officer.

24      21.     Defendant William H. Harris, Jr. ("Harris") served as a director of Intuit from 1998

25  to 2001, as its President and CEO from August 1998 to September 1999, and as its Executive Vice

26  President from December 1993 to August 1998.

27      22.     Defendant James J. Heeger ("Heeger") served as the Company's Senior Vice

28  President and General Manager of the Company's Small Business Division from July 1997 to June

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
MASTER CASE NO. C06-04387 PVT (PVT)                                    4
48913

2000. Heeger also served as Chief Financial Officer and Senior Vice President of Administration from April 1995 to July 1997 and as Vice President and General Manager of Supplies Division from December 1993 to April 1995.

23.     Defendant Richard W. Ihrie ("Ihrie") has served as Intuit's Senior Vice President and Chief Technology Officer since November 2000 and was Acting Chief Information Officer from January 2001 to August 2001.

24.     Defendant David A. Kinser ("Kinser") has served as Intuit's Senior Vice President, Delivery Service and Operations since 1997.

25.     Defendant John Monson ("Monson") served as Intuit's Vice President of Marketing and later formed and lead its Small Business Division from 1994 to 1997.

26.     Defendant Lorrie M. Norrington ("Norrington") served as the Company's Executive Vice President, Office of the CEO from January 2002 to June 2005, and as Senior Vice President of Intuit's small business division from July 2001 to January 2002.

27.     Defendant Stephen D. Pelletier ("Pelletier") served as the Company's Vice President and General Manager and ran Intuit's Automated Financial Services Business Unit from 1994 to June 1996.

28.     Defendant Gregory J. Santora ("Santora") served as the Company's Chief Financial Officer and Senior Vice President from 1997 to 2002.

29.     Defendant Raymond J. Stern ("Stern") served as Senior Vice President and Chief Financial Officer of Intuit from July 1997 to January 2003. He held other senior finance positions at Intuit, including Vice President of Finance and Corporate Services from November 1996 to July 1997 and Corporate Controller from February 1996 to November 1996.

30.     Collectively, defendants Bennett, Campbell, Cook, Dunn, Harris, Heeger, Ihrie, Kinser, Monson, Norrington, Pelletier, Santora, and Stern are referred to herein as the "Officer Defendants."

31.     Defendant Christopher W. Brody ("Brody") has served as a director of Intuit since 1993 and has also served as a member of the Compensation Committee since December 2000 and as a member of the Audit Committee of the Board (the "Audit Committee") since at least 1996.

32.     Defendant L. John Doerr ("Doerr") has served as a director of Intuit since August 1990 and as a member of the Compensation Committee from 1996 to 1999.

33.     Defendant Donna Dubinsky ("Dubinsky") has served as a director of Intuit since 1999 and as a member of the Audit Committee since August 2000.

34.     Defendant Michael R. Hallman ("Hallman") has served as a director of Intuit since 1993 and has also served as a member of the Compensation Committee since at least 1996 and as a member of the Audit Committee since August 2000.

35.     Defendant Dennis Powell ("Powell") has served as a director of Intuit and as Chairman of the Audit Committee since 2004.

36.     Defendant Stratton Sclavos ("Sclavos") has served as a director of Intuit since August 2001.

37.     Collectively, defendants Bennett, Brody, Campbell, Cook, Doerr, Dubinsky Hallman, Powell, and Sclavos are referred to herein as the "Director Defendants."

38.     Collectively, the Officer Defendants and the Director Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

40.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

41.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

a.      exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

b.      exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

c.      exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company; and

d.      exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

e.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

42.     The Individual Defendants, particularly the Officer Defendants and the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

(1)     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

    (a)     transactions are executed in accordance with management's general or specific authorization, and

    (b)     transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

43.     Intuit's Audit Committee Charter provides that the Audit Committee shall be responsible for, among other things:

    a.     Reviewing, prior to releasing to the public, the type of financial information, and the presentation of that information, to be included in the Company's annual earnings releases, as well as the annual financial statements to be included in the Company's Form 10-Ks. This review shall include a discussion of the matters required to be addressed by SAS 61, including (1) discussions with management and the independent auditors concerning any significant issues regarding accounting principles, practices and judgments (including any changes in accounting principles), and (2) discussions with the independent auditors' concerning their judgments about the quality and appropriateness of the Company's accounting principles as applied in its financial reporting;

    b.     Performing similar reviews with respect to the Company's Form 10-Qs and quarterly earnings press releases;

    c.     In connection with the Committee's review of the quarterly and annual financial statements, discussing with management and the independent auditors the Company's selection, application and disclosure of critical accounting policies, any significant changes in the Company's accounting policies and any proposed changes in accounting or financial reporting that may have a significant impact on the Company;

    d.     In connection with the Company's review of the annual financial statements, obtaining and reviewing a report from the independent auditors addressing: (1) all critical accounting policies and practices used, (2) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, the ramifications of each alternative and the treatment preferred by the independent auditors, and (3) other material communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences; and

e.   Recommending to the Board whether the annual financial statements should be included in the Annual Report on Form 10-K, based on (1) the Committee's review and discussion with management of the annual financial statements, (2) the Committee's discussion with the independent auditors of the matters required to be discussed by SAS 61, and (3) the Committee's review and discussion with the independent auditors of the independent auditors' independence and the written disclosures and letter from the independent auditors required by Independence Standards Board Standard No. 1.

## FACTUAL ALLEGATIONS

### Backdating of Stock Option Grants to the Officer Defendants

44.   According to Intuit's proxy statements, the Compensation Committee is responsible for determining the salaries, incentive compensation, and stock option awards for executive officers of Intuit and administering the Company's stock option plans.

45.   From 1995 to 2002, the Compensation Committee granted certain Intuit stock options to the Officer Defendants, as follows:

| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 09/30/95 | Campbell | $47.000 | 50,000 |
| | Harris | $47.000 | 50,000 |
| | Monson | $47.000 | 7,000 |
| | Dunn | $47.000 | 25,000 |
| | Pelletier | $47.000 | 25,000 |
| 06/11/97 | Campbell | $24.500 | 500,000 |
| | Harris | $24.500 | 500,000 |
| 06/30/97 | Heeger | $22.940 | 50,000 |
| | Dunn | $22.940 | 50,000 |
| 08/01/97 | Cook | $27.000 | 250,000 |
| 10/27/97 | Kinser | $30.250 | 50,000 |
| 11/07/97 | Stern | $30.250 | 100,000 |
| 08/03/98[1] | Kinser | $16.375 | 150,000 |
| | Stern | $16.375 | 120,000 |

---

[1] The exercise price and the number of options purportedly granted on August 3, 1998 have been adjusted for the Company's 3-for-1 stock split effective October 1, 1999.

| 05/07/99[2] | Kinser | $26.208 | 150,000 |
|---|---|---|---|
| | Stern | $26.208 | 150,000 |
| 05/18/00 | Santora | $26.125 | 100,000 |
| 08/01/00 | Cook | $35.000 | 100,000 |
| | Santora | $35.000 | 40,000 |
| 11/27/00 | Ihrie | $47.688 | 100,000 |
| 02/09/01 | Bennett | $34.063 | 500,000 |
| 04/24/01 | Ihrie | $29.380 | 50,000 |
| | Santora | $29.380 | 40,000 |
| | Stern | $29.380 | 50,000 |
| 9/25/02 | Bennett | $44.320 | 225,000 |
| | Norrington | $44.320 | 50,000 |
| | Stern | $44.320 | 37,500 |
| | Ihrie | $44.320 | 37,500 |

46.     Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1993 Equity Incentive Plan and the 1996 Director Stock Option Plan, the exercise price of options shall equal "the fair market value of the Company's common stock . . . at the time the option is granted," and fair market value is equal to, "as of any date, the value of the share of the Company's Common Stock determined [by] . . . its last reported sale price," i.e., closing price.

47.     Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

48.     Pursuant to Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any

---

[2] The exercise price and the number of options purportedly granted on May 7, 1999 have been adjusted for the Company's 3-for-1 stock split effective October 1, 1999.

payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

49.     In a striking pattern that could not have been the result of chance, most of the foregoing stock option grants were dated just after a sharp drop and just before a substantial rise in Intuit's stock price, as demonstrated in the following charts:

a.      Summary of Option Grants and Surrounding Stock Price Performance

| Purported Date of Grant | Exercise Price | Stock Price 10 Trading Days Before Purported Grant Date | Stock Price 10 Trading Days After Purported Grant Date | % Rise in Stock Price After Purported Grant Date |
|---|---|---|---|---|
| 09/30/95 | $47.000 | $45.880 | $48.130 | 2.40% |
| 06/11/97[3] | $24.500 | $28.380 | $23.250 | -5.10% |
| 06/30/97 | $22.940 | $25.000 | $25.000 | 8.98% |
| 08/01/97[4] | $27.000 | $24.500 | $24.870 | -7.89% |
| 10/27/97 | $30.250 | $33.500 | $31.160 | 3.01% |
| 11/07/97[5] | $30.250 | $33.880 | $29.620 | -2.08% |
| 08/03/98[6] | $16.375 | $21.667 | $16.127 | -1.52% |
| 05/07/99[7] | $26.208 | $31.500 | $26.417 | 0.80% |
| 05/18/00 | $26.125 | $33.500 | $42.620 | 63.14% |
| 08/01/00 | $35.000 | $39.560 | $42.750 | 22.14% |
| 11/27/00 | $47.688 | $60.880 | $52.560 | 10.22% |
| 02/09/01 | $34.063 | $36.120 | $45.120 | 32.46% |
| 04/24/01 | $29.380 | $29.740 | $34.890 | 18.75% |
| 9/25/02 | $44.320 | $46.760 | $45.900 | 3.56% |

/     /     /

---

[3] Although there is no immediate rise following the purported grant date, the option grant is dated at a relatively low point of the fiscal year, as demonstrated herein
[4] Id.
[5] Id.
[6] Id.  The exercise price and closing prices pertinent to the options purportedly granted on August 3, 1998 have been adjusted for the Company's 3-for-1 stock split effective October 1, 1999.
[7] The exercise price and closing prices pertinent to the options purportedly granted on May 7, 1999 have been adjusted for the Company's 3-for-1 stock split effective October 1, 1999.

b.   Stock Price Performance Surrounding Options Grant Dated 09/30/95



c.   Stock Price Performance Surrounding Options Grant Dated 06/11/97



d.   Stock Price Performance Surrounding Options Grant Dated 06/30/97



1

e.     Stock Price Performance Surrounding Options Grant Dated 08/01/97



f.     Stock Price Performance Surrounding Options Grant Dated 10/27/97



g.     Stock Price Performance Surrounding Options Grant Dated 11/07/97



/       /       /

1
2
3
4
5
6
7
8

h.    Stock Price Performance Surrounding Options Grant Dated 08/03/98



9
10
11
12
13
14
15
16

i.    Stock Price Performance Surrounding Options Grant Dated 05/07/99



17
18
19
20
21
22
23
24
25

j.    Stock Price Performance Surrounding Options Grant Dated 05/18/00



26
27
28

1  k.  Stock Price Performance Surrounding Options Grant Dated 08/01/00



9  l.  Stock Price Performance Surrounding Options Grant Dated 11/27/00



m.  Stock Price Performance Surrounding Options Grant Dated 02/09/01



/      /      /

n.   Stock Price Performance Surrounding Options Grant Dated 04/24/01



04/24/01: Options granted at $29.38

o.   Stock Price Performance Surrounding Options Grant Dated 09/25/02



09/25/02: Options granted at $44.32

50.   The reason for the extraordinary pattern set forth in the preceding paragraph is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Rather, at the behest of the Officer Defendants, the Director Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Intuit stock was lower than the market price on the actual grant dates. This improper backdating, which violated the terms of the Company's shareholder-approved stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Officer Defendants and improperly reduced the amounts the Officer Defendants had to pay the Company upon exercise of the options.

51.   The Individual Defendants' backdating of stock options was particularly egregious in fiscal years 1996, 1997, 1998, 1999, 2000, and 2001, when they backdated options to coincide

with some of Intuit's lowest closing prices of those respective fiscal years, as demonstrated in the following charts:

a.   Closing Stock Prices of Fiscal Year ended July 31, 1996



b.   Closing Stock Prices of Fiscal Year ended July 31, 1997



c.   Closing Stock Prices of Fiscal Year ended July 31, 1998



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

d.  Closing Stock Prices of Fiscal Year ended July 31, 1999



e.  Closing Stock Prices of Fiscal Year ended July 31, 2000



f.  Closing Stock Prices of Fiscal Year ended July 31, 2001



CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
MASTER CASE NO. C06-04387 PVT (PVT)
48913

52.     Prior to the enactment of the Sarbanes-Oxley Act of 2002 ("SOX"), the Individual Defendants were able to engage in backdating of option grants with relative ease because under federal law they were only required to report option grants to the SEC once a year.

53.     Pursuant to SOX, beginning on August 29, 2002, executives are required to report option grants to the SEC within two days of the grant.

54.     Following the enactment of SOX, however, the Individual Defendants continued to backdate option grants. Specifically, the Compensation Committee granted certain of the Officer Defendants Intuit stock options purportedly on September 25, 2002.

55.     Although the Officer Defendants who received the options grant were required to report them to the SEC on Form 4's within two days of the grants, they did not do so. In fact, Bennett, Norrington, Stern, and Ihrie did not file Form 4's reporting their September 25, 2002 option grant.

### The Individual Defendants' Dissemination of False Financial Statements

56.     As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants,

        a.    violated the terms of the Company's shareholder-approved stock option plans by granting stock options with exercise prices less than the fair market value of the stock on the actual date of grant;

        b.    violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

        c.    violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

        d.    produced and disseminated to Intuit shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants, and thereby understated compensation expenses and overstated net income.

57.     The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, inter alia, the following Form 10-K filings:

a.  Form 10-K for fiscal year ended July 31, 1996, filed with the SEC on October 24, 1996 and signed by defendants Campbell, Heeger, Santora, Cook, Brody, Doerr, and Hallman;

b.  Form 10-K405 for fiscal year ended July 31, 1997, filed with the SEC on October 15, 1997 and signed by defendants Campbell, Santora, Cook, Brody, Doerr, and Hallman;

c.  Form 10-K for fiscal year ended July 31, 1998, filed with the SEC on October 6, 1998 and signed by defendants Harris, Santora, Campbell, Cook, Brody, Doerr, and Hallman;

d.  Form 10-K for fiscal year ended July 31, 1999, filed with the SEC on October 12, 1999 and signed by defendants Campbell, Santora, Cook, Brody, Doerr, Dubinsky, Hallman, and Harris;

e.  Form 10-K405 for fiscal year ended July 31, 2000, filed with the SEC on October 13, 2000 and signed by defendants Santora, Bennett, Brody, Campbell, Cook, Dubinsky, Hallman, and Harris;

f.  Form 10-K405 for fiscal year ended July 31, 2001, filed with the SEC on October 5, 2001 and signed by defendants Santora, Bennett, Brody, Campbell, Cook, Dubinsky, Doerr, Hallman, and Sclavos;

g.  Form 10-K for fiscal year ended July 31, 2002, filed with the SEC on September 25, 2002 and signed by defendants Santora, Bennett, Brody, Campbell, Cook, Dubinsky, Doerr, Hallman, and Sclavos;

h.  Form 10-K for fiscal year ended July 31, 2003, filed with the SEC on September 19, 2003 and signed by defendants Bennett, Brody, Campbell, Cook, Dubinsky, Doerr, Hallman, and Sclavos;

i.  Form 10-K for fiscal year ended July 31, 2004, filed with the SEC on September 24, 2004 and signed by defendants Bennett, Brody, Campbell, Cook, Dubinsky, Doerr, Hallman, Powell, and Sclavos;

j.  Form 10-K for fiscal year ended July 31, 2005, filed with the SEC on September 26, 2005 and signed by defendants Bennett, Brody, Campbell, Cook, Dubinsky, Doerr, and Hallman, and Sclavos; and

k.  Form 10-K for fiscal year ended July 31, 2006, filed with the SEC on September 15, 2006 and signed by defendants Bennett, Brody, Campbell, Cook, Dubinsky, Doerr, Hallman, Powell, and Sclavos.

/    /    /

## The Individual Defendants' Concealment of Their Misconduct

58.    From 1996 to 2003, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Officer Defendants and falsely stated that options were granted to the Officer Defendants at "fair market value on the date of grant," as follows:

    a.    Intuit's proxy statement filed with the SEC on October 24, 1996 falsely reported that options granted to Campbell, Harris, Monson, Dunn, and Pelletier were granted on September 30, 1995;

    b.    Intuit's proxy statement filed with the SEC on November 26, 1997 falsely reported that options granted to Campbell and Harris were granted on June 11, 1997 and options granted to Heeger and Dunn were granted on June 30, 1997;

    c.    Intuit's proxy statement filed with the SEC on November 25, 1998 falsely reported that options granted to Cook were granted on August 1, 1997, options granted to Kinser were granted on October 27, 1997, and options granted to Stern were granted on November 7, 1997;

    d.    Intuit's proxy statement filed with the SEC on October 27, 1999 falsely reported that options granted to Kinser and Stern were granted on August 3, 1998 and May 7, 1999;

    e.    Intuit's proxy statement filed with the SEC on November 3, 2000 falsely reported that options granted to Santora were granted on May 18, 2000;

    f.    Intuit's proxy statement filed with the SEC on November 29, 2001 falsely reported that options granted to Cook and Santora were granted on August 1, 2000, options granted to Ihrie were granted on November 27, 2000, options granted to Bennett were granted on February 9, 2001, and options granted to Ihrie, Santora, and Stern were granted on April 24, 2001; and

    g.    Intuit's proxy statement filed with the SEC on October 2, 2003 falsely reported that options granted to Bennett, Norrington, Stern, and Ihrie were granted on September 25, 2002.

59.    From 2003 to 2006, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the

improper option backdating, filed with the SEC Form 4's that falsely reported the dates of stock option grants to the Officer Defendants, as follows:

    a.    Stern's Form 4 filed with the SEC on November 20, 2002 falsely reported that options granted to Stern had been granted on November 7, 1997;

    b.    Santora's Form 4 filed with the SEC on November 22, 2002 falsely reported that options granted to Santora has been granted on August 1, 1997, August 3, 1998, May 7, 1999, May 8, 2000, August 1, 2000, and April 24, 2001;

    c.    Stern's Form 4 filed with the SEC on November 26, 2002 falsely reported that options granted to Stern had been granted on August 3, 1998;

    d.    Ihrie's Form 4 filed with the SEC on December 5, 2002 falsely reported that options granted to Ihrie had been granted on April 24, 2001;

    e.    Campbell's Form 4 filed with the SEC on August 29, 2003 falsely reported that options granted to Campbell had been granted on June 11, 1997;

    f.    Campbell's Form 4 filed with the SEC on November 26, 2003 falsely reported that options granted to Campbell had been granted on June 11, 1997;

    g.    Ihrie's Form 4 filed with the SEC on November 23, 2005 falsely reported that options granted to Ihrie had been granted on April 24, 2001;

    h.    Campbell's Form 4 filed with the SEC on December 15, 2005 falsely reported that options granted to Campbell had been granted on June 11, 1997; and

    i.    Cook's Form 4 filed with the SEC on March 29, 2006 falsely reported that options granted to Cook had been granted on August 1, 1997.

60.    In May 2006, Intuit initiated an internal investigation of its past option granting practices in response to a report from the Center of Financial Research and Analysis that identified Intuit as being at risk for having backdated options.

61.    On June 9, 2006, Intuit filed its quarterly report with the SEC for the quarter ended April 30, 2006 and disclosed that the SEC has began an investigation in Intuit's historical stock option grants:

> In light of recent reports in the media of public company stock option practices, including a report from the Center for Financial Research and Analysis, Intuit has begun a voluntary review of our historical stock option grant activities and related accounting treatment. Our board of directors has

formed a special committee of independent directors to conduct this internal review with the assistance of independent legal counsel and independent accounting support, and the review is underway and ongoing. In addition, subsequent to our initiation of this review, we received a letter from the Securities and Exchange Commission regarding an informal inquiry, and we have informed the SEC staff of the status of our review. We believe that the financial statements included in this report on Form 10-Q fairly present in all material respects the financial condition, results of operations and cash flows of Intuit for the periods presented. However, additional facts may come to light once the review is complete, and there can be no assurance that we will not determine that we need to change our accounting treatment of stock options granted in prior periods, which may have a material adverse effect on our results of operations for those periods or other periods.

62.     On June 29, 2006, Intuit issued a press release announcing an investigation by the U.S. Attorney's Office for the Northern District of California into the Company's prior stock option granting practices.

63.     On August 16, 2006, Intuit issued a press release announcing the conclusion of its internal investigation into its past option grants and denying any "fraud or intentional wrongdoing" with regard to its historical stock option granting practices:

Intuit Inc. (Nasdaq: INTU) announced today that the special committee composed of independent members of its Board of Directors has completed the previously announced independent review of historical options granting practices. The comprehensive review, conducted with the assistance of independent counsel and external forensic accountants, uncovered no evidence of fraud or intentional wrongdoing in the company's historical stock option granting practices. The primary scope of the review covered the period from Aug. 1, 1997 to the present.

Based on the findings of the independent review, the company has concluded that it does not anticipate any restatement of its previously filed financial statements. The company has reported this conclusion to the Securities and Exchange Commission and the United States Attorney for the Northern District of California and will cooperate with any further inquiries.

As previously announced, on Aug. 22, 2006 Intuit will issue the company's financial results for the fiscal quarter and year ended July 31, 2006.

64.     Intuit's purportedly "independent" review of its options granting practices has no credibility and should be disregarded in its entirety because, among other things, the directors who oversaw the review were not remotely independent (for the reasons described in detail herein); the "primary scope" of the review did not cover options granted prior to August 1, 1997; the Company has not offered any legitimate explanation for the extraordinary patterns described herein; and the

1    Company has not disclaimed **all** wrongdoing, but only "fraud and intentional wrongdoing in the

2    company's historical stock option granting practices."

3        65.     Furthermore, Intuit has never disclosed, among other things: (i) which directors

4    served on the special committee; (ii) the basis for the so-called "independence" of the members of

5    the special committee; (iii) the complete (as opposed "primary") temporal scope of the special

6    committee's investigation; (iv) the nature and substance of the special committee's investigation,

7    e.g., what documents, if any, the special committee reviewed, what witnesses, if any, the special

8    committee interviewed, etc.; (v) the identities of the purportedly independent counsel and forensic

9    accountants who worked on the investigation; (vi) the basis for the special committee's conclusion

10   that there was no "fraud or intentional wrongdoing in our historical stock option granting

11   practices;" and (vii) whether the special committee found evidence of misconduct other than "fraud

12   or intentional wrongdoing."

13       66.     In addition, despite Intuit's reporting the results of its internal investigation to the

14   SEC and U.S. Attorney's Office, there is no indication that those agencies have terminated or

15   abandoned their investigations of the Company.

16                          **The Individual Defendants' Insider Selling**

17       67.     During the relevant period, certain of the Individual Defendants (collectively, the

18   "Insider Selling Defendants"), while in possession of materially adverse non-public information

19   regarding the backdating of stock options and the false financial statements resulting therefrom,

20   sold more than $150 million in Intuit stock, a significant portion of which was obtained through the

21   exercise of improperly backdated stock options, as demonstrated below:

| NAME | DATE OF TRANSACTION | SHARES DISPOSED | PRICE PER SHARE | PROCEEDS |
|------|--------------------|-----------------|-----------------|----------|
| Bennett | 03/27/03 | 17,532 | $39.02 | $684,098.64 |
| | 02/23/04 | 17,157 | $44.64 | $765,888.48 |
| | 02/25/05 | 15,945 | $41.81 | $666,660.45 |
| | 09/15/05 | 100,000 | $44.57 | $4,457,000.00 |
| | | | Total = | $6,573,647.57 |
| Campbell | 08/29/03 | 50,000 | $45.13 | $2,256,375.00 |
| | 11/26/03 | 50,000 | $49.64 | $2,481,845.00 |
| | 12/14/05 | 10,812 | $54.94 | $594,011.28 |
| | | 2,043 | $54.95 | $112,262.85 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | | | | 300 | $54.97 | $16,491.00 |
| 2 | | | | 1,700 | $55.00 | $93,500.00 |
| | | | | 900 | $55.02 | $49,518.00 |
| 3 | | | | 45,187 | $55.03 | $2,486,640.61 |
| | | | | 7,603 | $55.04 | $418,469.12 |
| 4 | | | | 9,151 | $55.05 | $503,762.55 |
| | | | | 7,109 | $55.06 | $391,421.54 |
| 5 | | | | 3,700 | $55.07 | $203,759.00 |
| | | | | 200 | $55.08 | $11,016.00 |
| 6 | | | | 500 | $55.09 | $27,545.00 |
| 7 | | | | 600 | $55.10 | $33,060.00 |
| | | | | 735 | $54.63 | $40,153.05 |
| 8 | | | | 400 | $54.64 | $21,856.00 |
| 9 | | | | 2,731 | $54.65 | $149,249.15 |
| | | | | 1,200 | $54.66 | $65,592.00 |
| 10 | | | | 822 | $54.67 | $44,938.74 |
| | | | | 1,900 | $54.68 | $103,892.00 |
| 11 | | | | 700 | $54.69 | $38,283.00 |
| 12 | | | | 2,070 | $54.70 | $113,229.00 |
| | | | | 300 | $54.71 | $16,413.00 |
| 13 | | | | 500 | $54.72 | $27,360.00 |
| | | | | 200 | $54.73 | $10,946.00 |
| 14 | | | | 8 | $54.75 | $438.00 |
| | | | | 400 | $54.77 | $21,908.00 |
| 15 | | | | 100 | $54.79 | $5,479.00 |
| | | | | 2,200 | $54.80 | $120,560.00 |
| 16 | | | | 900 | $54.81 | $49,329.00 |
| | | | | 229 | $54.82 | $12,553.78 |
| 17 | | | | 100 | $54.83 | $5,483.00 |
| | | | | 1,581 | $54.84 | $86,702.04 |
| 18 | | | | 883 | $54.85 | $48,432.55 |
| 19 | | | | 16,100 | $54.86 | $883,246.00 |
| | | | | 3,719 | $54.87 | $204,061.53 |
| 20 | | | | 100 | $54.88 | $5,488.00 |
| | | | | 100 | $54.89 | $5,489.00 |
| 21 | | | | 7,509 | $54.90 | $412,244.10 |
| | | | | 1,199 | $54.91 | $65,837.09 |
| 22 | | | | 2,225 | $54.92 | $122,197.00 |
| | | | | 2,800 | $54.93 | $153,804.00 |
| 23 | | | | 2,000 | $54.21 | $108,420.00 |
| | | | | 3,800 | $54.22 | $206,036.00 |
| 24 | | | | 1,600 | $54.23 | $86,768.00 |
| | | | | 700 | $54.24 | $37,968.00 |
| 25 | | | | 800 | $54.25 | $43,400.00 |
| | | | | 7,712 | $54.26 | $418,453.12 |
| 26 | | | | 3,508 | $54.27 | $190,379.16 |
| | | | | 1,300 | $54.28 | $70,564.00 |
| 27 | | | | 2,400 | $54.29 | $130,296.00 |
| 28 | | | | 7,580 | $54.30 | $411,594.00 |

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
MASTER CASE NO. C06-04387 PVT (PVT)
48913

25

| | | | 900 | $54.31 | $48,879.00 |
|---|---|---|---|---|---|
| | | | 100 | $54.33 | $5,433.00 |
| | | | 4,500 | $54.44 | $244,980.00 |
| | | | 6,041 | $54.45 | $328,932.45 |
| | | | 1,100 | $54.46 | $59,906.00 |
| | | | 3,193 | $54.47 | $173,922.71 |
| | | | 1,009 | $54.48 | $54,970.32 |
| | | | 600 | $54.49 | $32,694.00 |
| | | | 207 | $54.50 | $11,281.50 |
| | | | 557 | $54.52 | $30,367.64 |
| | | | 300 | $54.54 | $16,362.00 |
| | | | 343 | $54.55 | $18,710.65 |
| | | | 3,090 | $54.56 | $168,590.40 |
| | | | 1,210 | $54.57 | $66,029.70 |
| | | | 500 | $54.58 | $27,290.00 |
| | | | 950 | $54.60 | $51,870.00 |
| | | | 1,750 | $54.61 | $95,567.50 |
| | | | 734 | $54.62 | $40,091.08 |
| | | | | Total = | $15,694,597.21 |
| Cook | 12/09/02 | | 1,500 | $50.02 | $75,030.00 |
| | | | 1,000 | $50.04 | $50,040.00 |
| | | | 27,700 | $50.00 | $1,385,000.00 |
| | 12/10/02 | | 80,200 | $50.03 | $4,012,750.86 |
| | | | 89,600 | $49.88 | $4,469,194.24 |
| | 01/02/03 | | 200,000 | $47.14 | $9,428,900.00 |
| | 09/19/03 | | 250,000 | $49.08 | $12,269,975.00 |
| | 09/22/03 | | 100,000 | $49.61 | $4,961,450.00 |
| | 03/29/05 | | 4,235 | $44.28 | $187,527.07 |
| | | | 5,000 | $44.25 | $221,262.00 |
| | | | 5,000 | $44.25 | $221,249.00 |
| | | | 865 | $44.25 | $38,276.25 |
| | | | 5,000 | $44.25 | $221,231.00 |
| | | | 1,100 | $44.25 | $48,675.00 |
| | | | 4,700 | $44.23 | $207,866.90 |
| | | | 5,000 | $44.22 | $221,100.00 |
| | | | 5,000 | $44.21 | $221,027.50 |
| | | | 5,000 | $44.11 | $220,570.50 |
| | | | 1,300 | $44.13 | $57,368.22 |
| | | | 5,000 | $44.13 | $220,646.00 |
| | | | 2,600 | $44.15 | $114,778.04 |
| | | | 3,177 | $44.20 | $140,419.91 |
| | | | 5,721 | $44.18 | $252,753.78 |
| | | | 5,000 | $44.17 | $220,828.00 |
| | | | 1,402 | $44.16 | $61,912.32 |
| | | | 5,000 | $44.04 | $220,208.00 |
| | | | 5,000 | $44.01 | $220,060.00 |
| | | | 415 | $44.01 | $18,263.15 |
| | | | 5,000 | $44.00 | $220,011.50 |
| | | | 5,000 | $44.01 | $220,061.00 |

| | | Quantity | Price | Total |
|---|---|---|---|---|
| | | 5,000 | $44.05 | $220,234.00 |
| | | 5,000 | $44.05 | $220,238.50 |
| | | 2,985 | $44.02 | $131,399.40 |
| | | 8,176 | $43.95 | $359,335.20 |
| | | 3,698 | $43.90 | $162,358.84 |
| | | 9,241 | $43.90 | $405,679.90 |
| | | 1,415 | $44.11 | $62,422.44 |
| | | 7,612 | $44.10 | $335,689.20 |
| | | 400 | $44.03 | $17,612.00 |
| | | 3,662 | $44.00 | $161,128.00 |
| | | 4,938 | $44.01 | $217,305.08 |
| | | 1,535 | $44.07 | $67,646.84 |
| | | 5,000 | $44.08 | $220,388.00 |
| | | 438 | $44.13 | $19,327.54 |
| | | 2,800 | $44.15 | $123,628.12 |
| | | 2,001 | $44.15 | $88,335.15 |
| | | 5,000 | $44.20 | $221,016.00 |
| | | 199 | $44.28 | $8,811.72 |
| | | 1,400 | $44.30 | $62,024.06 |
| | | 5,000 | $44.37 | $221,874.50 |
| | | 5,000 | $44.37 | $221,845.00 |
| | | 3,600 | $44.31 | $159,518.52 |
| | | 5,000 | $44.37 | $221,828.00 |
| | | 28,800 | $44.35 | $1,277,280.00 |
| | | 7,200 | $44.36 | $319,415.76 |
| | | 1,500 | $44.36 | $66,540.00 |
| | | 2,700 | $44.34 | $119,718.00 |
| | | 4,800 | $44.30 | $212,639.04 |
| | | 5,000 | $44.22 | $221,075.00 |
| | | 5,000 | $44.23 | $221,127.00 |
| | | 5,000 | $44.21 | $221,060.50 |
| | | 2,800 | $44.18 | $123,698.96 |
| | | 5,000 | $44.25 | $221,266.00 |
| | | 100 | $44.26 | $4,426.00 |
| | | 7,100 | $44.25 | $314,175.00 |
| | | 4,900 | $44.31 | $217,133.70 |
| | 03/30/05 | 5,000 | $44.03 | $220,144.00 |
| | | 5,000 | $44.01 | $220,032.00 |
| | | 5,000 | $44.00 | $220,005.50 |
| | | 5,000 | $44.03 | $220,168.00 |
| | | 4,928 | $44.04 | $217,043.90 |
| | | 72 | $44.08 | $3,173.76 |
| | | 1,500 | $44.01 | $66,018.00 |
| | | 1,600 | $44.00 | $70,400.96 |
| | | 2,002 | $44.02 | $88,124.04 |
| | | 5,000 | $44.01 | $220,029.00 |
| | | 5,000 | $44.02 | $220,085.50 |
| | | 5,000 | $44.02 | $220,075.50 |

| | | | 383 | $44.00 | $16,853.00 |
|---|---|---|---|---|---|
| | | 06/13/05 | 25,000 | $45.57 | $1,139,160.00 |
| | | | 20,600 | $45.59 | $939,090.14 |
| | | | 25,000 | $45.59 | $1,139,770.00 |
| | | | 24,000 | $45.54 | $1,092,943.20 |
| | | | 22,500 | $45.56 | $1,025,048.25 |
| | | | 16,600 | $45.58 | $756,639.62 |
| | | | 25,000 | $45.64 | $1,140,990.00 |
| | | | 25,000 | $45.55 | $1,138,637.50 |
| | | | 25,000 | $45.41 | $1,135,285.00 |
| | | | 25,000 | $45.42 | $1,135,447.50 |
| | | | 24,600 | $45.40 | $1,116,896.58 |
| | | | 13,173 | $45.40 | $598,043.66 |
| | | | 25,000 | $45.38 | $1,134,492.50 |
| | | | 3,527 | $45.34 | $159,914.18 |
| | | 09/19/05 | 107,033 | $44.80 | $4,795,078.40 |
| | | | 5,000 | $44.81 | $224,036.00 |
| | | | 5,000 | $44.83 | $224,150.00 |
| | | | 4,968 | $44.98 | $223,460.64 |
| | | | 3,900 | $44.98 | $175,439.16 |
| | | | 7,588 | $45.02 | $341,611.76 |
| | | | 1,511 | $45.08 | $68,115.88 |
| | | 09/20/05 | 165,000 | $44.80 | $7,392,000.00 |
| | | 12/02/05 | 5,000 | $53.55 | $267,764.50 |
| | | | 4,908 | $53.53 | $262,741.93 |
| | | | 92 | $53.50 | $4,922.00 |
| | | | 5,000 | $53.49 | $267,474.00 |
| | | | 4,000 | $53.49 | $213,960.00 |
| | | | 5,000 | $53.49 | $267,426.50 |
| | | | 3,800 | $53.48 | $203,241.86 |
| | | | 1,000 | $53.48 | $53,480.00 |
| | | | 1,200 | $53.46 | $64,152.00 |
| | | | 5,000 | $53.43 | $267,137.00 |
| | | | 800 | $53.40 | $42,720.00 |
| | | | 95 | $53.35 | $5,068.25 |
| | | | 5,000 | $53.35 | $266,737.00 |
| | | | 5,000 | $53.31 | $266,540.00 |
| | | | 2,100 | $53.31 | $111,941.97 |
| | | | 5,000 | $53.28 | $266,418.00 |
| | | | 3,000 | $53.28 | $159,842.10 |
| | | | 4,905 | $53.28 | $261,322.70 |
| | | | 2,000 | $53.27 | $106,534.00 |
| | | | 3,100 | $53.27 | $165,123.98 |
| | | | 5,000 | $53.26 | $266,291.00 |
| | | | 5,000 | $53.26 | $266,283.00 |
| | | | 5,000 | $53.25 | $266,247.50 |
| | | | 5,000 | $53.23 | $266,161.00 |
| | | | 5,000 | $53.21 | $266,053.50 |
| | | | 5,000 | $53.19 | $265,954.00 |

| | | Date | Shares | Price | Amount |
|---|---|---|---|---|---|
| 1 | | | 4,000 | $53.18 | $212,703.20 |
| 2 | | | 5,000 | $53.55 | $267,764.50 |
| | | | 4,908 | $53.53 | $262,741.93 |
| 3 | | | 92 | $53.50 | $4,922.00 |
| | | | 5,000 | $53.49 | $267,474.00 |
| 4 | | | 4,000 | $53.49 | $213,960.00 |
| | | | 5,000 | $53.49 | $267,426.50 |
| 5 | | | 3,800 | $53.48 | $203,241.86 |
| | | | 1,000 | $53.48 | $53,480.00 |
| 6 | | | 1,200 | $53.46 | $64,152.00 |
| 7 | | | 5,000 | $53.43 | $267,137.00 |
| | | | 800 | $53.40 | $42,720.00 |
| 8 | | | 95 | $53.35 | $5,068.25 |
| | | | 5,000 | $53.35 | $266,737.00 |
| 9 | | | 5,000 | $53.31 | $266,540.00 |
| | | | 2,100 | $53.31 | $111,941.97 |
| 10 | | | 5,000 | $53.28 | $266,418.00 |
| | | | 3,000 | $53.28 | $159,842.10 |
| 11 | | | 4,905 | $53.28 | $261,322.70 |
| 12 | | | 2,000 | $53.27 | $106,534.00 |
| | | | 3,100 | $53.27 | $165,123.98 |
| 13 | | | 5,000 | $53.26 | $266,291.00 |
| | | | 5,000 | $53.26 | $266,283.00 |
| 14 | | | 5,000 | $53.25 | $266,247.50 |
| | | | 5,000 | $53.23 | $266,161.00 |
| 15 | | | 5,000 | $53.21 | $266,053.50 |
| | | | 5,000 | $53.19 | $265,954.00 |
| 16 | | | 4,000 | $53.18 | $212,703.20 |
| 17 | | 03/27/06 | 68 | $51.66 | $3,512.88 |
| | | | 1,790 | $51.71 | $92,557.50 |
| 18 | | | 12,849 | $51.75 | $664,935.75 |
| | | | 5,000 | $51.75 | $258,758.00 |
| 19 | | | 3,895 | $51.75 | $201,583.39 |
| 20 | | | 5,000 | $51.76 | $258,780.00 |
| | | | 1,714 | $51.85 | $88,870.90 |
| 21 | | | 7,190 | $51.90 | $373,161.00 |
| | | | 7,500 | $51.92 | $389,400.00 |
| 22 | | | 1,842 | $51.98 | $95,753.05 |
| | | | 10,604 | $52.00 | $551,408.00 |
| 23 | | | 10,000 | $52.00 | $520,002.00 |
| | | | 2,832 | $52.00 | $147,272.50 |
| 24 | | | 2,696 | $52.00 | $140,193.89 |
| | | | 5,000 | $52.00 | $260,021.50 |
| 25 | | | 5,000 | $52.01 | $260,025.00 |
| | | | 1,452 | $52.01 | $75,513.00 |
| 26 | | | 2,100 | $52.01 | $109,221.00 |
| | | | 1,700 | $52.01 | $88,423.97 |
| 27 | | | 5,000 | $52.02 | $260,087.00 |
| 28 | | | 1,768 | $52.02 | $91,971.01 |

| Name | Date | Shares | Price | Total |
|---|---|---|---|---|
| | | 5,000 | $52.03 | $260,154.00 |
| | 03/28/06 | 25,000 | $51.50 | $1,287,507.50 |
| | | 4,432 | $51.50 | $228,265.28 |
| | | 8,894 | $51.51 | $458,098.81 |
| | | 8,604 | $51.51 | $443,210.97 |
| | | 25,000 | $51.52 | $1,287,912.50 |
| | | 5,000 | $51.53 | $257,657.50 |
| | | 9,742 | $51.54 | $502,080.27 |
| | | 2,388 | $51.57 | $123,149.16 |
| | | 9,958 | $51.61 | $513,932.38 |
| | | 17,700 | $51.63 | $913,854.54 |
| | | 1,712 | $51.70 | $88,518.45 |
| | | 13,000 | $51.71 | $672,240.40 |
| | | 10,600 | $51.71 | $548,142.96 |
| | | 3,000 | $51.72 | $155,156.10 |
| | | 6,900 | $51.73 | $356,968.74 |
| | | 3,500 | $51.75 | $181,132.00 |
| | | 15,127 | $51.77 | $783,167.15 |
| | | 3,773 | $51.79 | $195,412.73 |
| | | 4,872 | $51.81 | $252,426.12 |
| | | 8,428 | $51.83 | $436,819.03 |
| | | 5,100 | $51.90 | $264,706.83 |
| | | 1,470 | $51.50 | $75,705.00 |
| | 03/29/06 | 5,000 | $51.50 | $257,500.00 |
| | | 400 | $51.51 | $20,604.00 |
| | | 400 | $51.53 | $20,612.00 |
| | | | Total = | $103,180,907.06 |
| Doerr | 12/21/05 | 6,478 | $53.09 | $343,932.57 |
| | | 23 | $53.07 | $1,220.61 |
| | | 3,899 | $53.05 | $206,845.46 |
| | | 10,000 | $53.01 | $530,080.00 |
| | | 19,600 | $53.00 | $1,038,829.40 |
| | | 5,000 | $52.85 | $264,264.00 |
| | | | Total = | $2,385,172.04 |
| Dubinsky | 05/28/03 | 100 | $44.57 | $4,457.00 |
| | | 100 | $44.56 | $4,456.00 |
| | | 200 | $44.55 | $8,910.00 |
| | | 2,500 | $44.54 | $111,350.00 |
| | | | Total = | $129,173.00 |
| Hallman | 12/17/02 | 6,000 | $48.00 | $288,000.00 |
| | 12/14/05 | 6,191 | $55.04 | $340,752.64 |
| | | 300 | $55.06 | $16,518.00 |
| | | 1,196 | $55.02 | $65,803.92 |
| | | 1,600 | $55.00 | $88,000.00 |
| | | 1,200 | $54.99 | $65,988.00 |
| | | 4,196 | $54.98 | $230,696.08 |
| | | 200 | $54.97 | $10,994.00 |
| | | 1,200 | $54.96 | $65,952.00 |
| | | 2,100 | $54.94 | $115,374.00 |

| | | 1,000 | $54.93 | $54,930.00 |
|---|---|---|---|---|
| | | 5,544 | $54.91 | $304,421.04 |
| | | 600 | $54.90 | $32,940.00 |
| | | 5,000 | $54.89 | $274,450.00 |
| | | 200 | $54.88 | $10,976.00 |
| | | 500 | $54.86 | $27,430.00 |
| | | 400 | $54.85 | $21,940.00 |
| | | 4,878 | $54.84 | $267,509.52 |
| | | 1,000 | $54.83 | $54,830.00 |
| | | 200 | $54.82 | $10,964.00 |
| | | 595 | $54.81 | $32,611.95 |
| | | 900 | $54.80 | $49,320.00 |
| | | | Total = | $2,430,401.15 |
| Ihrie | 12/04/02 | 400 | $53.00 | $21,200.00 |
| | 11/22/05 | 49,100 | $53.50 | $2,626,850.00 |
| | | 400 | $53.51 | $21,404.00 |
| | | 100 | $53.52 | $5,352.00 |
| | | 293 | $53.45 | $15,660.85 |
| | | | Total = | $2,690,466.85 |
| Santora | 11/21/02 | 4,688 | $52.98 | $248,388.99 |
| | | 3,500 | $52.98 | $185,444.00 |
| | | 11,250 | $52.98 | $596,070.00 |
| | | 37,500 | $52.98 | $1,986,900.00 |
| | | 20,000 | $52.98 | $1,059,680.00 |
| | | 80,625 | $52.81 | $4,257,854.63 |
| | | 50,000 | $53.01 | $2,650,340.00 |
| | | 50,000 | $53.05 | $2,652,265.00 |
| | | 50,000 | $53.00 | $2,650,170.00 |
| | | 50,000 | $52.87 | $2,643,290.00 |
| | | 50,000 | $52.83 | $2,641,435.00 |
| | | 22,500 | $53.00 | $1,192,518.00 |
| | | 15,000 | $53.00 | $795,012.00 |
| | | | Total = | $23,559,367.62 |
| Stern | 11/19/02 | 18,750 | $50.00 | $937,541.25 |
| | 11/25/02 | 28,079 | $53.77 | $1,509,678.67 |
| | | | Total = | $2,447,219.92 |
| | | | GRAND TOTAL= | $159,090,952.41 |

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

68.    In a misguided effort to attract and retain employees in a competitive environment, Individual Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme. Individual Defendants' misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers and/or directors of the Company. Specifically, the Individual Defendants breached their fiduciary duties by:

a.     colluding with each other to backdate stock option grants;

b.     colluding with each other to violate GAAP and Section 162(m);

c.     colluding with each other to produce and disseminate to Intuit shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

d.     colluding with each other to file false proxy statements, false financial statements, and false Form 4 filings in order to conceal the improper backdating of stock options.

69.     The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

70.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur, loss of funds paid to the Company upon exercise of options, and costs and expenses incurred in connection with the SEC and U.S. Attorney's investigations.

71.     As alleged herein, the Officer Defendants have exercised hundreds of thousands of backdated options at improperly low prices and have then sold the shares for substantial profits. Consequently, the Officer Defendants have been unjustly enriched by garnering million of dollars in illicit profits and depriving the Company of millions of dollars in payment that the Company should have received upon exercise of the options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

72.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress Individual Defendants' breaches of fiduciary duties and unjust enrichment.

73.     Plaintiffs are owners of Intuit common stock and were owners of Intuit common stock at the time of the misconduct complained of herein.

74.     Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

75.    As a result of the facts set forth herein, Plaintiffs have not made any demand on the Intuit Board of Directors to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

76.    At the time this action was commenced the Board consisted of nine directors: defendants Bennett, Brody, Campbell, Cook, Doerr, Dubinsky, Hallman, Powell, and Sclavos.  The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

a.    Bennett, because as an Officer Defendant, he is directly interested in the improperly backdated stock option grants complained of herein.  Also, as a director of the Company at all relevant times, he directly participated in and knowingly approved the Company's backdating of stock options and filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.  In addition, Bennett's principal professional occupation is his position as President and Chief Executive Officer of the Company.  In his position as President and Chief Executive Officer, Bennett stands to earn hundreds of thousands of dollars in annual salary, bonuses, and other compensation, all of which must be approved by Defendants Brody and Hallman, who are currently on the Compensation Committee.  Accordingly, Bennett is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants;

b.    Brody, because as a member of both the Compensation Committee and Audit Committee, he directly participated in and approved the improper backdating of stock options and filing of false financial statements and other false SEC filings as alleged herein.  Also, as an Audit Committee member, Brody directly participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.  Moreover, by colluding with the Officer Defendants and others, as alleged herein, Brody has demonstrated that he is unable or unwilling to act independently of the Officer Defendants;

c.    Cook, because as an Officer Defendant, he is directly interested in the improperly backdated stock option grants complained of herein.  Also, as a director of the Company, he directly participated in and knowingly approved the Company's backdating of stock options and filing of false financial statements and other false SEC filings, as alleged herein, and therefore is

substantially likely to be held liable for the misconduct complained of herein;

d.   Campbell, because as an Officer Defendant, he is directly interested in the improperly backdated stock option grants complained of herein. Also, as a member of the Compensation Committee, Campbell directly participated in and approved the improper backdating of stock options, as alleged herein. In addition, as a director of the Company at all relevant times, Campbell directly participated in and knowingly approved the filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein;

e.   Doerr, because as a member of the Compensation Committee, he directly participated in and approved the improper backdating of stock options, as alleged herein. Also, as a director of the Company, he directly participated in and approved the Company's filing of false financial statements and other SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the Officer Defendants and others, as alleged herein, Doerr has demonstrated that he is unable or unwilling to act independently of the Officer Defendants;

f.   Dubinsky, because as a member of the Audit Committee, she directly participated in and knowingly approved the filing of false financial statements and other false SEC filings as alleged herein and directly participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the Officer Defendants and others, as alleged herein, Dubinsky has demonstrated that she is unable or unwilling to act independently of the Officer Defendants;

g.   Hallman, because as a member of both the Compensation Committee and Audit Committee, he directly participated in and approved the improper backdating of stock options and the filing of false financial statements and other false SEC filings as alleged herein. Also, as an Audit Committee member, Hallman directly participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the Officer Defendants and others, as alleged herein, Hallman has demonstrated that he is unable or unwilling to act independently of the Officer Defendants;

h.   Powell, because as a member of the Audit Committee, he directly participated in and knowingly approved the filing of false financial statements and other SEC filings as alleged herein and directly participated

in and approved the Company's violations of GAAP and Section 162(m), as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the Officer Defendants and others, as alleged herein, Powell has demonstrated that he is unable or unwilling to act independently of the Officer Defendants; and

i. Sclavos, because as a Director Defendant, he knowingly approved the filing of financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.

77. Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment. As represented in Intuit's proxy statements, the stated purpose of the Company's shareholder-approved stock option plans is to motivate employees by providing compensation that reflects the performance of the Company and "align[s] their interests with stockholders' interests." However, by granting options with backdated exercise prices, the Individual Defendants undermined the purpose of the stock option plans by awarding employees compensation that had intrinsic value regardless of Intuit's performance. In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders.

78. The Individual Defendants could have achieved the stated purpose of attracting and retaining employees by granting those employees additional options under their incentive plans, or by granting options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants. Instead, the Individual Defendants were able to placate Intuit's employees by backdating option grants in violation of the Company's shareholder-approved stock option plans and improperly reporting these grants in their financial disclosures to improve their bottom line.

## COUNT I

### Against the Individual Defendants for
### Violations of § 10(b) and Rule 10b-5 of the Securities Exchange Act

79. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

80.     Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to divert millions of dollars to the Individual Defendants via improper option grants.

81.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included, among other things, the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting material facts necessary in order to make the statements made about Intuit not misleading.

82.     The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and/or directors of the Company, each of the Individual Defendants was able to and did control the conduct complained of herein and the content of the public statements disseminated by Intuit.

83.     The Individual Defendants acted with scienter throughout the relevant period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

84.     Each of the Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Intuit, which relied on the Individual Defendants' fraud in granting the Officer Defendants options to purchase Intuit common stock.

85.     By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder and have thereby caused Intuit to sustain damages, as alleged herein.

/     /     /

# COUNT II

## Against the Individual Defendants for
## Violations of §14(a) of the Securities Exchange Act

86.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

87.     Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14-A-9.

88.     The 1996-2003 Proxy Statements violated §14(a) and Rule 14-A-9 because they omitted material facts, including the fact that the Individual Defendants were causing Intuit to engage in an option backdating scheme, a fact which the Individual Defendants were aware of and participated in from at least 1996.

89.     In the exercise of reasonable care, the Individual Defendants should have known that the Proxy Statements were materially false and misleading.

90.     The misrepresentation and omissions in the Proxy Statements were material to Plaintiffs in voting on each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of the Individual Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation, and the Company's compensation policies.

91.     The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

/     /     /

## COUNT III

### Against Dunn, Harris, Heeger, Santora, Stern, and the Director Defendants for Violations of §20(a) of the Securities Exchange Act

92.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

93.     Dunn, Harris, Heeger, Santora, Stern, and the Director Defendants, by virtue of their positions with Intuit and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Intuit within the meaning of §20(a) of the Exchange Act. They had the power and influence and exercised the same to cause Intuit to engage in the illegal conduct and practices complained of herein.

## COUNT IV

### Against the Individual Defendants for Accounting

94.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

95.     At all relevant times, the Individual Defendants, as directors and/or officers of Intuit, owed the Company and its shareholders fiduciary duties of good faith, care, candor, and loyalty.

96.     In breach of their fiduciary duties owed to Intuit and its shareholders, the Individual Defendants caused Intuit, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of Intuit. By this wrongdoing, the Individual Defendants breached their fiduciary duties owed to Intuit and its shareholders.

97.     The Individual Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the Officer Defendants.

98.     As a result of the Individual Defendants' misconduct, Intuit has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options, which have been exercised and sold.

1    99.    Plaintiffs demand an accounting be made of all stock option grants made to the

2    Individual Defendants, including, without limitation, the dates of the grants, the amounts of the

3    grants, the value of the grants, the recipients of the grants, the exercise dates of stock options

4    granted to the Individual Defendants, as well as the disposition of any proceeds received by the

5    Individual Defendants via sale or other exercise of backdated stock option grants received by the

6    Officer Defendants.

7                                   **COUNT V**

8                         **Against the Individual Defendants for**
9                **Breach of Fiduciary Duty and/or Aiding and Abetting**

10   100.   Plaintiffs incorporate by reference and reallege each and every allegation set forth

11   above, as though fully set forth herein.

12   101.   The Individual Defendants agreed to and did participate with and/or aided and

13   abetted one another in a deliberate course of action designed to divert corporate assets in breach of

14   fiduciary duties they owed to the Company.

15   102.   The Individual Defendants have violated fiduciary duties of loyalty, good faith,

16   candor, and independence owed to Intuit and its public shareholders, have engaged in unlawful

17   self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of

18   the interests of Intuit and its shareholders.

19   103.   As demonstrated by the allegations above, the Individual Defendants breached their

20   duties of loyalty, good faith, candor, and independence owed to Intuit and its public shareholders.

21   104.   As a proximate result of the Individual Defendants' conduct, Intuit has been injured

22   and is entitled to damages.

23                                  **COUNT VI**

24                        **Against the Individual Defendants for**
25                              **Constructive Fraud**

26   105.   Plaintiffs incorporate by reference and reallege each and every allegation set forth

27   above, as though fully set forth herein.

28

106.     As corporate fiduciaries, the Individual Defendants owed to Intuit and its shareholders a duty of candor and full accurate disclosure regarding the true state of Intuit's business and assets and their conduct with regard thereto.

107.     As a result of the conduct complained of, the Individual Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Intuit's shareholders despite their duties to, inter alia, disclose the true facts regarding their stewardship of Intuit.  Thus they have committed constructive fraud and violated their duty of candor.

108.     By reason of the foregoing, Intuit has been damaged.

## COUNT VII

### Against the Individual Defendants for
### Corporate Waste

109.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

110.     As a result of the conduct described above, the Individual Defendants will be and have been unjustly enriched at the expense of Intuit, in the form of unjustified salaries, benefits, bonuses, stock option grants, and other emoluments of office.

111.     All the payments and benefits provided to the Individual Defendants were at the expense of Intuit.  The Company received no benefit from these payments.  Intuit was damaged by such payments.

112.     Certain of the defendants sold Intuit stock for a profit during the period of deception, misusing confidential non-public corporate information.  These defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of Intuit.  A constructive trust for the benefit of the Company should be imposed thereon.

/       /       /

## COUNT VIII

### Against the Individual Defendants for
### Common Law Restitution/Unjust Enrichment

113.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

114.   As a result of the conduct described above, the Individual Defendants will be and have been unjustly enriched at the expense of Intuit, in the form of unjustified salaries, benefits, bonuses, stock option grants, and other emoluments of office.

115.   All the payments and benefits provided to the Individual Defendants were at the expense of Intuit. The Company received no benefit from these payments. Intuit was damaged by such payments.

116.   Certain of the defendants sold Intuit stock for a profit during the period of deception, misusing confidential non-public corporate information. These defendants should be required to disgorge the gains, which they have and/or will otherwise unjustly obtain at the expense of Intuit. A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT IX

### Against the Officer Defendants for
### Rescission

117.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

118.   As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and Intuit entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit, and abuse of control. Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding Officer Defendants' employment agreements and the Company's stock option plan, which was also approved by Intuit shareholders and filed with the SEC.

119.   All contracts, which provide for stock option grants between the Officer Defendants and Intuit and were entered into during the relevant period should, therefore, be rescinded, with all

sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT X

### Against the Officer Defendants for
### Breach of Contract

120.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

121.    As a result of the backdating of options granted to them, the Officer Defendants have breached their employment agreements with Intuit and violated the stock option plan, all of which provide that the exercise price of all of the stock options would be no less than the fair market value of the Company's common stock, measured by the publicly traded closing price for Intuit stock, on the date of the grant.

122.    Intuit and its shareholders have been damaged by the Officer Defendants' breach of contract.

## COUNT XI

### Against the Insider Selling Defendants for
### Violation of California Corporation Code §25402

123.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

124.    At the time that the Insider Selling Defendants sold their Intuit common stock as set forth herein, by reason of their high executive and/or directorial positions with Intuit, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of Intuit's option backdating, improper accounting, and false financial statements.

125.    At the time of such sales, that information was not generally available to the public or the securities markets. Had such information been generally available, it would have significantly reduced the market price of Intuit shares at that time.

1    126.    The Insider Selling Defendants, and each of them, had actual knowledge of

2    material, adverse non-public information and thus sold their Intuit common stock in California in

3    violation of California Corporations Code § 25402.

4    127.    Pursuant to California Corporations Code § 25502.5, the Insider Selling Defendants,

5    and each of them, are liable to Intuit for damages in an amount up to three times the difference

6    between the price at which Intuit common stock was sold by these defendants, and each of them,

7    and the market value which Intuit common stock would have had at the time of the sale if the

8    information known to these defendants, and each of them, had been publicly disseminated prior to

9    that time and a reasonable time had elapsed for the market to absorb the information.

10   WHEREFORE, Plaintiffs demand judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the
amount of damages sustained by the Company as a result of the Individual
Defendants' misconduct;

B.    Ordering the Officer Defendants to disgorge to the Company all of the
backdated stock options they received, including the proceeds of any such
options that have been exercised, sold, pledged, or otherwise monetized, and
imposing a constructive trust thereover;

C.    Awarding the Company treble damages as provided by California
Corporations Code § 25502.05;

D.    Granting appropriate equitable relief to remedy Individual Defendants'
breaches of fiduciary duties;

E.    Awarding to Plaintiffs the costs and disbursements of the action, including
reasonable attorneys' fees, accountants' and experts' fees, costs, and
expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

/    /    /

/    /    /

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury.

Dated:  October 10, 2006                    Respectfully submitted,

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP

_____
Kathryn A. Schofield

Alan R. Plutzik
L. Timothy Fisher
Kathryn A. Schofield
2125 Oak Grove Road, Suite 120
Walnut Creek, California  94598
Telephone:  (925) 945-0200
Facsimile:  (925) 945-8792

*Liaison Counsel for Plaintiffs*

SCHIFFRIN & BARROWAY LLP
Eric L. Zagar
Robin Winchester
280 King of Prussia Road
Radnor, PA  19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056

*Attorney for Plaintiffs*

## VERIFICATION

I, Don Gallardo, hereby verify that I have authorized the filing of the attached Consolidated Shareholder Derivative Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: _10-6-2006_                          _Don Gallardo_
                                           DON GALLARDO

281561.1

**VERIFICATION**

I, Beth Amado, hereby verify that I have authorized the filing of the attached

Consolidated Shareholder Derivative Complaint, that I have reviewed the Complaint, and that

the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: _10/5/06_

BETH AMADO

281561.1

**VERIFICATION**

I, **Diane Linen Powell**, hereby verify that I have authorized the filing of the attached Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE: __10/10/06__

__Diane Linen Powell__
**DIANE LINEN POWELL**

281561.1